**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

| | | |
|---|---|---|
| HECTOR HERNANDEZ, <br> 3406 Holly Creek Drive, Apt. 3E <br> Laurel, MD 20724 | : <br> : <br> : <br> : | Civil Case No. 17-2285 |
| Plaintiff, | : <br> : | |
| v. | : <br> : | |
| WHOLESALE SCREENING SOLUTIONS, INC., | : <br> : | |
| Serve: D. Mark Lowers, Registered Agent <br> 125 E. Hirst Road, Suite 3C <br> Purcellville, VA 20132 | : <br> : <br> : <br> : | |
| Defendant. | : <br> : | |

**COMPLAINT**

The Plaintiff, Hector Hernandez, files this Complaint against Defendant Wholesale Screening Solutions, Inc. ("Defendant"). In support thereof, Plaintiff alleges as follows:

**PRELIMINARY STATEMENT**

1. This is an action for actual, statutory and punitive damages, costs and attorney's fees brought against the Defendant pursuant to 15 U.S.C. § 1681 *et seq*. (Federal Fair Credit Reporting Act or "FCRA"). Section 1681e(b) is one of the cornerstone provisions of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*. Whenever a consumer reporting agency ("CRA") prepares a consumer report, § 1681e(b) requires the CRA to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b). This section imposes a high, and often disregarded, standard on CRAs. *See, e.g., Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874,

at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b), and explaining that " 'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993)).

2. Defendant is a consumer-reporting agency that compiles and maintains files on consumers on a nationwide basis. It then sells consumer reports generated from its database to other consumer reporting agencies ("CRAs"), who incorporate Defendant's reports into the information provided to employers. Due to its lax threshold for matching a criminal record to a consumer, Defendant issued an erroneous background check on Plaintiff in connection with his application for employment with Uber in February 2016. The consumer report provided by Defendant to Checkr, Inc.—who in turn furnished the report to Uber—was grossly inaccurate and contained a felony conviction that did not belong to Plaintiff for purportedly possessing between 5 and 50 pounds of marijuana. As a result of this inaccurate report, Uber denied Plaintiff for employment. Accordingly, Plaintiff alleges a claim under § 1681e(b) of the FCRA because Defendant failed to use "reasonable procedures to assure maximum possible accuracy" when it furnished the report regarding Plaintiff.

3. Plaintiff also alleges a claim under 15 U.S.C. § 1681g, which requires CRAs to "clearly and accurately" disclose to consumers "all of the information" in their files. Defendant ignored Plaintiff's repeated requests for copies of his file. Defendant withholds this information in order to avoid disclosing to consumers the inaccurate and incomplete information it furnished regarding them and to minimize compliance costs.

## JURISDICTION

4. The Court has jurisdiction under the FCRA, 15 U.S.C. § 1681p and 28 U.S.C. § 1331. Venue is proper in this Court under 28 U.S.C. § 1391(b) and LR 501(4)(b)(i) as Plaintiff, the only Maryland resident, resides in this division.

## PARTIES

5. Plaintiff is a natural person and a "consumer" as defined by the § 1681a(c) of the FCRA.

6. Defendant Wholesale Screening Solutions, LLC ("Defendant") is a limited liability company organized under the laws of Virginia. Defendant is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f) that regularly provides reports for employment purposes. Typically, Defendant furnishes its consumer reports to other CRAs, who then provide the information therein to employers. Employers use these reports to make important decisions, such as whether to hire, terminate, or promote the consumers who are the subjects of the reports.

## FACTUAL ALLEGATIONS

**A.  The Pervasive Use and Accuracy Problems with Criminal Background Checks.**

7. Before the enactment of the Fair Credit Reporting Act ("FCRA"), inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA in 1970 due to ensure the "confidentiality, accuracy, relevancy, and proper utilization" of credit reports. 15 U.S.C. § 1681(b).

8. Although no comprehensive study focusing on the accuracy of criminal record reports industrywide, several recent studies demonstrate the prevalence of major inaccuracies in criminal background reports.

9. For example, a 2013 study by the National Employment Law Project examined criminal background checks conducted by the FBI. Nat'l Employment Law Project, *Wanted: Accurate FBI Background Checks for Employment* (July 30, 2013), available at www.nelp.org/publication/wanted-accurate-fbi-background-checks-for-employ-ment/ (last visited July 12, 2017). Although "considered the gold standard" of criminal background checks, the NELP study found that "50 percent of the FBI's records fail to include information on the final disposition of the case" including "missing information [] frequently beneficial to job seekers." *Id*.

10. NELP estimated that 1.8 million workers were subject to an FBI background check per year, resulting in 600,000 individuals who were subject to a report that failed to "include up-to-date and accurate information that would benefit them." *Id*.

11. Similar to the NELP's survey, the National Association of State PIRGs conducted a study regarding error rates in consumer reports and found that that "79% of the credit reports contained either serious errors or other mistakes of some kind."[1]

12. Despite the overwhelming percentage of inaccuracies, approximately ninety-three percent of employers procure background checks on employees and job applicants.[2]

13. Unlike traditional credit reporting which is dominated by Experian, Equifax, and Trans Union, there are hundreds, if not thousands, of criminal background screening companies, and it is a $2 billion a year industry.[3]

---

[1] Nat'l Association of State PIRGS, *Mistakes Do Happen: A Look at Errors in Consumer Credit Reports*, 4 (June 2004), http://www.uspirg.org/sites/pirg/files/reports/Mistakes_Do_Happen_2004_USPIRG.pdf (last visited July 12, 2017).

[2] Nat'l Consumer Law Ctr., *Broken Records*, 3 (April 2012), available at http://www.nclc.org/images/pdf/pr-reprts/broken-records-report.pdf.

[3] IBISWorld, Inc., *Background Check Services in the US: Report Snapshot* (April 2014), http://www.ibisworld.com/industry/background-check-services.html (last visited July 12, 2017).

14. Because of the number of background check companies from which to obtain a background report, it is nearly impossible for a consumer to verify that his or her criminal background check will be accurate in advance of the report being furnished to an employer.

15. Common errors in reports include: attributing a criminal record to the wrong person, reporting outdated information, misclassification of the severity of an offense (reporting misdemeanors as felonies and civil infractions as misdemeanors); and reporting expunged convictions or charges.[4]

16. Beyond the risks posed by the sheer volume of the information and players involved in the industry, the manner in which many companies prepare criminal history reports increases the risk of inaccuracies.

17. Companies often purchase criminal data in bulk and in static form, or access databases that are infrequently updated.

18. Additionally, CRAs often resell criminal history reports from other CRAs that contain information that is not current or accurate—arrests that result in dismissal, felony charges that are reduced to misdemeanor convictions.

19. Moreover, few public record sources that are easily accessible provide all personal identifiers for the person associated with a record (e.g., date of birth, social security number, or middle name) which causes records to be matched with the wrong consumer.

20. Accordingly, background check companies often use loose matching criteria when assigning information in their database to a consumer—often requiring no more than a name and a date of birth match.

---

[4] Nat'l Consumer Law Ctr., *Broken Records*, *supra* at 7.

21. Less than six months ago, a jury in Florida awarded a consumer $3.5 million dollars ($250,000 compensatory and $3.3 million in punitive damages) after one of Defendant's competitors, First Advantage, misidentified him as a criminal in a background check. *Williams v. First Advantage LNS Screening Sols., Inc.*, 2017 WL 819486, at *1 (N.D. Fla. Mar. 2, 2017).

22. Upon information and belief, First Advantage used almost identical matching procedures as Defendant.

**B.    Defendant Furnished a Grossly Inaccurate Consumer Report Concerning Plaintiff.**

23. In February 2016, Plaintiff applied to be a driver with Uber.

24. In connection with this employment application, Uber procured a consumer report from Checkr, who obtained a consumer report from Defendant and incorporated it into the report furnished to Uber.

25. The inaccurate information contained in the consumer report was based on criminal record information gathered and assembled by Defendant.

26. In particular, Defendant's report to Checkr about Plaintiff included information about a felony conviction from Texas that did not belong to Plaintiff.

27. The criminal record indicated that Plaintiff had a felony conviction for purportedly possessing between 5 and 50 pounds of marijuana.

28. This conviction did not belong to Plaintiff, who has never lived or worked in Texas.

29. Uber forwarded the inaccurate and defamatory report to the State of Maryland as part of Plaintiff's application for a Transportation Network Operator or "TNO" license.

30. The State of Maryland refused to provide Plaintiff with the necessary TNO licenses because of the criminal record.

31. Plaintiff spent many months trying to get the State of Maryland to reconsider so he

could have the opportunity to provide for his family and infant daughter.

32. Plaintiff lost thousands of dollars in income that could have provided for him and his wife and young child.

33. Upon information and belief, this inaccurate reporting was caused by Defendant's failure to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the consumer reports it published and maintained regarding Plaintiff.

34. If Defendant had reasonable procedures (or any procedures whatsoever), it could have easily determined that the information in Plaintiff's consumer report belonged to another person with a similar name. Indeed, Plaintiff never lived or worked in the states where the criminal convictions occurred.

35. Moreover, according to the underlying court records, the name associated with the criminal conviction was "Hector David Hernandez-Garcia."

36. However, upon information and belief, despite multiple lawsuits and complaints notifying Defendant of the inadequacies of its procedures, Defendant continues to use lax thresholds and overly broad matching criteria to match public record data to the consumer reports that it furnishes to third parties.

37. At all times relevant hereto, Defendant's conduct was willful and carried out in reckless disregard for a consumer's rights under the FCRA. By example only and without limitation, Defendant's conduct was willful because it was intentionally accomplished through its intended procedures; these procedures have continued despite the fact that Defendant and other consumer reporting agencies have been subject to court decisions critical of similar conduct; and Defendant will continue to engage in this conduct because it believes there is greater economic value in selling over-inclusive consumer reports.

**A.     Defendant Ignored Plaintiff's Requests for Copies of Her File.**

38.    Pursuant to 15 U.S.C. § 1681g, consumer reporting agencies are required, on request, to provide consumers with the full file maintained on the consumer by the reporting agency. The "full file" includes "[a]ll information in the consumer's file at the time of the request." 15 U.S.C. § 1681g(a)(1).

39.    After the inaccurate and incomplete information was furnished to Checkr, Plaintiff requested a copy of his credit file from Defendant, who ignored Plaintiff's request on multiple occasions and never responded to Plaintiff's inquiry.

40.    Because Defendant had a file on Plaintiff within the meaning of the FCRA, it was obligated to provide Plaintiff with all information in Plaintiff's consumer files, including everything delineated in 15 U.S.C. 1681g. Yet, Defendant failed to comply with its legal obligations.

41.    Defendant withholds this information in order to avoid disclosing to consumers the inaccurate and incomplete information it furnished regarding them and to minimize compliance costs.

42.    Defendant thus deprives consumers of valuable congressionally-mandated information, which increases the risk of harm that consumers will be unable to correct errors relating to these public records.

43.    As a result of Defendant's conduct, Plaintiff suffered actual damages and concrete injuries, including increased anxiety, stress, and continued to damage to his reputation.

**COUNT ONE:**
**(Violation of 15 U.S.C. § 1681e(b))**

44.    Plaintiff reiterates each of the allegations in the preceding paragraphs as if set forth

at length herein.

45. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report it furnished regarding the Plaintiff.

46. As a result of Defendant's conduct, Plaintiff suffered actual damages including but not limited to: denial of the opportunity to drive for Uber in Maryland where he lives, lost wages, damage to his reputation, embarrassment, humiliation and other mental and emotional distress.

47. Defendant's violation of 15 U.S.C. § 1681e(b) was willful, rendering it liable pursuant to 15 U.S.C. § 1681n. In the alternative, the Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

48. Plaintiff is entitled to recover actual damages and/or statutory damages, punitive damages, costs and attorneys' fees from the Defendant pursuant to §§ 1681n and 1681o.

## COUNT TWO:
### (Violation of 15 U.S.C. § 1681g)

49. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

50. Defendant violated § 1681g when it ignored Plaintiff's requests for a copy of his file.

51. The violations by Defendant were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

52. In the alternative, Defendant was negligent, which entitles Plaintiff to recovery under 15 U.S.C. §1681o.

53. Plaintiff is entitled to recover actual damages, statutory damages, costs and

attorney's fees from Defendant in an amount to be determined pursuant to 15 U.S.C. § 1681n and § 1681o.

WHEREFORE, Plaintiff demands judgment for actual, statutory and punitive damages against Defendant; for his attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate, and such other relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully Submitted,
**HECTOR D. HERNANDEZ**

By: __*/s/ Kristi C. Kelly*_____
        Counsel

Kristi Cahoon Kelly, Esq. (No. 07244)
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone:  703-424-7576
Facsimile:  703-591-0167
E-mail:  kkelly@kellyandcrandall.com
*Counsel for Plaintiff*